Wandra B. GREEN and Michael L. Nelson, Appellants,

v.

UNITY SCHOOL OF CHRISTIANITY, Respondent.

No. WD 55867.

Missouri Court of Appeals, Western District.

May 11, 1999.

Richard I. Buchli, II, Kansas City, for Appellant.

Jeffery S. Henry, Kansas City, for Respondent.

Before HANNA, P.J., ELLIS and RIEDERER, JJ.

RIEDERER, Judge.

Wandra Green and Michael Nelson are the wife and son, respectively, of decedents Jerry Green and Groman Nelson. Appellants appeal from summary judgment entered by the Honorable Jon R. Gray, denying their claim for damages for the wrongful deaths of Messrs. Green and Nelson. Because we find that the record in this case does not support liability under either Section 323 or 343 of the Restatement (Second) of Torts, we affirm.

## Facts

Unity Lake No. 2 is a private lake owned by Respondent, and it provides drinking water for the township of Unity Village, Missouri. The lake is available year-round to Respondent's employees and their guests for fishing, subject to Respondent's rules and regulations. One such rule is that only one guest at a time can accompany each employee onto the lake for boating and fishing. Respondent's Country Club Committee and Director of Village Services promulgate all rules regarding usage of the lake. In 1993, Respondent's employees wanting to fish on the lake were required to obtain a fishing permit that was issued after they signed a Unity Village Fishing Privilege Agreement. This Agreement required, among other things, its signor to verify that:

> I realize that I fish on Unity Village Lake at MY OWN RISK, and I will not hold Unity School or any of its employees or officials responsible for my safety, or for the safety of my family or guests.

The Fishing Privilege Agreement also provided that fishing was only permitted between one hour before sunrise and one hour after sunset. The record reflects that decedent Groman Nelson, an employee of Respondent, signed such an Agreement and received a fishing permit from Respondent.

There is an access gate through which one must pass to get to the lake's boat dock. Affixed to that gate are two locks. All of Respondent's country club members have a key to the first lock, but only Respondent's security department has a key to the second lock. Respondent's security department customarily locks the second lock one hour after sunset and unlocks it one hour before sunrise in accordance with the fishing time restriction. Respondent published a brochure entitled, "Unity – 100 Years of Faith and Vision." It was an exhibit in the record and provided in part:

> [o]ur Security Department provides 24–hour building and grounds security with

special emphasis on off-hours. The officers also provide help to residents and guests on request. The dispatch team monitors alarms, handles radio traffic, and is ready to respond to any emergency 24 hours a day.

On December 10, 1993, sunset was at 4:56 PM. On that day, security officer Jasper Cogdill was scheduled to be on duty at Respondent's grounds from 4:00 p.m. to midnight. Cogdill went to lock the lake access gate at approximately 6:40 p.m. that evening. It was the first time that any security officer checked the lake that evening. When Cogdill arrived at the boat dock area, he noticed an empty car in the parking lot. The car's doors were unlocked, and keys were in the ignition. Cogdill immediately called in the car's license plate to the Unity Village dispatcher whereupon the dispatcher confirmed that Mr. Nelson owned the car. Aware that no one was permitted to be on the lake at this time of evening, Cogdill proceeded to the lake's dam area to see if he could find anyone still out on the lake, but to no avail. Immediately thereafter, Cogdill then left the lake to return to his post.

At about 8:15 p.m. that night, Cogdill returned to the lake and discovered that Nelson's car was still there. Cogdill then unsuccessfully attempted to phone another of Respondent's employees to request assistance in checking around the lake for boaters. Without checking the dock for missing boats, Cogdill again left the lake. Cogdill returned to the lake a third time at approximately 9:23 p.m. accompanied by another Unity employee, Floyd Pearl. At that time, they determined that Nelson's boat was missing from the dock. Cogdill then left the lake to get another security officer, Joe Decker. When Cogdill and Decker returned to the lake, they honked their car horn and yelled out for a response, but no one responded. They also flashed a spotlight over a part of the lake, but did not see anyone. After a few minutes, the three men left the lake to return to Respondent's security office. Cogdill then phoned decedent Nelson's residence, but got no answer. Immediately thereafter, the officers telephoned Respondent's director of security, Reggie Baumgardner. In his deposition, Cogdill testified, "I told him we found the car and whose it was, the employee whose car it was. We couldn't find anybody around the boat dock and we had been to the dam, couldn't find anybody. We tried the telephone number we had listed, no answer." Baumgardner advised the men to suspend their search until daylight the next day.

Sometime during the afternoon of Saturday, December 11, decedent Nelson's wife phoned Unity Village Security and reported that her husband had gone fishing after getting off work the previous day, but he had not returned home. Unity Village security officers Joe Decker and Iris Zuzunegui then began searching by foot around the perimeter of the lake. Finally, at approximately 3:10 p.m. on December 11, 1993, Decker and Zuzunegui spotted an overturned boat and what appeared to be a body floating on the lake. They immediately summoned the County Sheriff to the scene. Divers for the Sheriff's Department retrieved the lifeless body of decedent Jerry Green. Nine days later on December 20, 1993, Groman Nelson's body was discovered and retrieved from the bottom of the lake by the Lee's Summit Underwater Rescue and Recovery team.

The Missouri State Water Patrol's report indicates that medical examinations of the bodies determined that both men likely died of hypothermia. Neither man drowned. The body of Mr. Green showed bruising on the arms, above the wrists and on the outside of the little finger. A deputy for the Water Patrol wrote in the report that a medical examiner stated, "this is common in cases where the victim may have been holding/clinging to some object, possibly a boat." The report also stated that the primary cause of the accident was overloading of the boat, which caused it to capsize.

## Standard of Review

The propriety of summary judgment is an issue of law which we review *de novo*. *ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We examine the entire record to determine whether there is any genuine issue of material fact and whether the moving party was entitled to judgment as a matter of law. *Dial v. Lathrop R–II School District*, 871 S.W.2d 444, 446 (Mo. banc 1994). We view the record in the light most favorable to the party against whom summary judgment was entered, and will affirm if the judgment is sustainable under any legal theory. *ITT*, 854 S.W.2d at 376.

## Discussion

Appellants claim that the trial court erred by granting summary judgment, because they established that Respondent had a duty to protect the decedents pursuant to §§ 323 and 343 of the Restatement (Second) of Torts. Although Appellants state their argument as one point, they make two distinct arguments.

■ Under Missouri law, a plaintiff must establish the following to prevail on a negligence claim: (1) existence of a duty on the part of the defendant to protect plaintiff from injury; (2) failure of the defendant to perform that duty; and (3) injury to the plaintiff resulting from such failure. *Nappier v. Kincade*, 666 S.W.2d 858, 860 (Mo.App.1984). Whether a duty exists is a question of law for the court to decide. *Strickland v. Taco Bell Corp.*, 849 S.W.2d 127, 131 (Mo.App.1993). In this case, we look to determine whether Respondent had a duty to protect the decedents by virtue of Respondent's status as a landowner and/or whether a duty was created as a result of Respondent's representations or actions.

## Section 343

■ With regard to § 343, Appellants argue that "Respondent's restrictions and regulations concerning the use of this lake created a dangerous facility and greatly magnified and changed the normal risks inherent in the sport of fishing." The restrictions and regulations complained of are: (1) Respondent required users of the lake to enter through a locked gate, and (2) Respondent allowed each permit holder to bring only one guest at a time onto the property. Appellant claims that the result of these regulations and restrictions was that (1) it was not possible for the decedents to set up their own safety net of onlookers, and (2) the decedents were forced to rely on (a) Respondent's duty to enforce the lake rules and (b) Respondent's representations that its Security Department was "ready to respond to any emergency 24 hours a day."

■ The standard of care owed by a possessor of land depends upon the status of the injured party. *Peterson v. Summit Fitness, Inc.*, 920 S.W.2d 928, 932 (Mo. App.1996). An invitee "is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land." *Harris v. Niehaus*, 857 S.W.2d 222, 225 (Mo. banc 1993) (quoting, Restatement (2nd) of Torts, § 332 (1965)). Decedents were invitees. Appellants correctly argue that, under § 343 of the Restatement (2nd) of Torts,

> a possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he:
>
> > (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> > (c) fails to exercise reasonable care to protect them against the danger.

*Peterson*, 920 S.W.2d at 932. In *Peterson*, the court followed the Restatement formu-

lation of the duty owed by possessors of land to those who come onto the land. *Id.* Appellants argue that the three elements [ (a) – (c) ] of this standard are met in this case. Application of these principles to the facts of this case does create a duty on the part of this possessor of land to the decedents.

Element (a) of § 343 consists of two parts: (1) the possessor of the land knows or by the exercise of reasonable care would discover the condition and (2) the possessor of the land should realize that the condition involves an unreasonable risk of harm to these invitees. Appellants claim that element (a) is met because Respondent "not only knew about the condition, it created it." However, Appellants do not identify the "condition on the land" which is alleged to have caused the harm in this case. We surmise it is Respondent's enforcement of its rules and regulations requiring entry through a locked gate and restricting guests to one. If this were a "condition on the land," then we would agree with Appellants that the first part of this element of the standard is met because Respondent knew about this condition, inasmuch as Respondent made these rules. However, we cannot agree that this standard is met under the facts of this case, because a set of rules is not a "condition on the land." Examination of the record reveals that the only "condition on the land" identified by Appellants is the locked gate and fence surrounding the lake. However, Appellants have not claimed that the fence and locked gate caused the physical harm to the decedents. Nor would the record bear out such a claim. Since Appellants cannot prove that there was a condition on the land that caused the harm to the decedents, there can be no liability under § 343.

### Section 323

■ Appellants also claim Respondent owed a duty to the decedents under Section 323 of the Restatement (Second) of Torts by virtue of Respondent's represen-

tations in its brochure. The Missouri Supreme Court has adopted § 323. *Stanturf v. Sipes,* 447 S.W.2d 558, 561–62 (Mo.1969). This section provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if:

(a) his failure to exercise such increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

"Missouri case law supports the proposition that one who acts gratuitously or otherwise is liable for the negligent performance of an act, even though there was no duty to act originally." *Brown v. Michigan Millers Mutual Insurance Co., Inc.,* 665 S.W.2d 630, 634 (Mo.App.1983).

The record reveals that Respondent represented that its "Security Department provides 24–hour building and grounds security." Appellants argue that by issuing the brochure entitled, "Unity – 100 Years of Faith and Vision," in which Respondent stated, "The dispatch team.. is ready to respond to any emergency 24 hours a day," Respondent undertook an obligation to render services that Respondent should have known were necessary to protect its members and their guests while on the lake. Appellants further argue that Respondent failed to perform its undertaking with reasonable care and therefore should be liable under § 323. Appellants claim the record supports a recovery under both subsections (a) and (b). We disagree.

In order to prevail under § 323, Appellants had to prove that Respondent undertook "to render services" to decedents and that Respondent should recognize these services as "necessary for the protection of" decedents. If Appellants prove this proposition, then Respondent is subject to liability to decedents for physical harm

"resulting from its failure to exercise reasonable care to perform its undertaking," but only if (a) failure to exercise such care increased the risk of such harm, or (b) the harm was suffered because of the decedent's reliance upon the undertaking.

The first element of this standard is that there must be an "undertaking," and we therefore address at the outset whether there is any evidence in the record that there was and "undertaking" under § 323. We conclude that there is not. First, the Restatement does not define "undertaking." Webster's dictionary defines "undertake" to mean "to take upon oneself; to set about." Webster's New World Dictionary, Second College Edition, 1548 (1970). Under the facts of this case, there is no evidence of any act that meets this definition. Appellants do not identify what act of Respondent was alleged to have been such an undertaking, although they argue that "Respondent represented that it would enforce the lake rule for all users and provide security and emergency response capability 24 hours a day ..." It is apparent that Appellants argue that the "undertaking" was the publishing of the brochure. However, the record does not reveal when, where or to whom that text was published. There is no evidence that the decedents even knew about this brochure. We conclude that the publishing of that brochure, under the facts of this case, is not an undertaking under § 323.

■ Next, we examine whether the brochure's text is a promise. Although Appellants did not expressly argue that Respondent promised the decedents that it would provide emergency response services to them, we address this issue because it is apparent that Appellants believe that the language of the brochure is tantamount to a promise. Comments to § 323 of the Restatement indicate that it takes no position on whether a mere promise, "without in any way entering upon performance," is an undertaking sufficient for liability under this section. Section 323 of the Restatement (Second) of Torts, comment d (1965). These comments also indicate that a promise might ripen into an undertaking if there were reliance on that promise. However, the record in this case does not indicate any such reliance. Appellants argue that decedents were "forced to rely" on Respondent because of its rules and regulations, but this misses the mark. Alleging that decedents were "forced to rely" on Respondent does not relieve Appellants of their obligation to produce some evidence that decedents actually did rely on the representations in the brochure. The record is devoid of any such evidence. There is no evidence that decedents even knew of the existence of the brochure, let alone relied on it.

Thus, we conclude that there is no evidence of an "undertaking" by Respondent. Since there is no undertaking, there can be no liability under § 323 of the Restatement (Second) of Torts.

The judgment of the trial court is affirmed.

All concur.