

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| D.J., BY AND THROUGH HIS NEXT FRIEND, ROSE JACKSON, | ) ) ) | No. ED111487 |
| Respondent, | ) ) | |
| vs. | ) ) | |
| FIRST STUDENT, INC., | ) ) | Appeal from the Circuit Court of the City of St. Louis |
| Appellant, | ) ) | |
| And | ) ) | Honorable Rex M. Burlison |
| TOMIKA L. RICHARDSON, | ) ) | Filed: June 25, 2024 |
| Defendant. | ) ) | |

### Introduction

First Student, Inc. appeals the circuit court's judgment entered after a jury returned a verdict against it and in favor of D.J. ("Child"), by and through his next friend, R.J. ("Mother"), after Child was struck by a passing car after unloading from a school bus operated by Tomika Richardson ("Richardson") on behalf of First Student (collectively, "Defendants"). First Student raises four points on appeal arguing the circuit court erred in overruling its motion for judgment notwithstanding the verdict ("JNOV"). In Point I, First Student argues it was entitled to JNOV because it complied with its *only* legal duty to Child, which was to drop him off at a reasonably

safe place, and the *McGinnis* doctrine precluded any additional liability.[1] In Point II, First Student argues it was entitled to JNOV because the jury was precluded from determining additional, independent theories of negligence under the *McHaffie* rule when First Student admitted Richardson was acting within the course and scope of her employment.[2] In Point III, First Student argues it was entitled to JNOV because the verdict director improperly instructed the jury to determine purely evidentiary details while omitting the ultimate issue of whether Richardson dropped off Child at a reasonably safe place. In Point IV, First Student argues it was entitled to JNOV because the passing car driver's conduct was an intervening cause breaking the causal connection between Child's injuries and First Student's negligence.

Because First Student's duty to Child arose from the bus contract, by its own conduct, and its requirement to exercise due care to avoid foreseeable injury, and because the record supports breach, causation, and injury, Child made a submissible case establishing negligence as submitted in Jury Instruction No. 8. Thus, the circuit court did not err in overruling First Student's JNOV motion and Point III is denied. Because the passing car driver's conduct is not an intervening cause breaking the causal connection between Child's injuries and First Student's negligence, the circuit court did not err in overruling First Student's JNOV motion. Point IV is denied. Because neither the *McGinnis* doctrine nor the *McHaffie* rule apply under these circumstances, the circuit court did not err in overruling First Student's JNOV motion. Points I and II are denied.

The circuit court's judgment is affirmed.

---

[1] *See McGinnis v. Chicago, R.I. & P. Ry. Co.*, 98 S.W. 590 (Mo. 1906).
[2] *See McHaffie By & Through McHaffie v. Bunch*, 891 S.W.2d 822 (Mo. banc 1995).

## Factual and Procedural History

*First Student Transportation Services*

KIPP St. Louis ("KIPP") operates charter schools in the St. Louis area. KIPP solicited requests for proposal ("RFP") and contracted with First Student, which transports approximately five million students throughout the country each day, to provide school bus transportation for its students ("bus contract"). The bus contract states KIPP's RFP, First Student's proposal, and the bus contract govern the parties' relationship. KIPP's RFP provides, "The safety of our students is our primary priority," and directs First Student to adhere to "[a]ll applicable laws, local school district policies and regulations."

KIPP's RFP requires First Student to be "responsible for implementing and administering a comprehensive safety plan," including "continuing on-the-road training and classroom training for all drivers . . . ." First Student's "Commercial Driver's License (CDL) Training Program Participant Study Guide" ("training manual") discusses "danger zones." First Student's training manual states, "Danger zones are areas outside the bus where children are in the most danger of being hit, either by another vehicle or their own bus." The training manual explicitly warns, "the area to the left of the bus is *always* considered dangerous because of *passing cars*." (Emphasis added.) The training manual contains a diagram of a school bus with the left side of the bus labeled "Danger From Passing Cars." A copy of that diagram, set out below, was in evidence before the jury.

3



The bus contract states First Student "shall be primarily responsible for *planning* all routes, *stops* and schedules in coordination with, and based upon, [KIPP] specifications." (Emphasis added.) First Student must use a software system when creating routes and generating stops. Any "stop location and/or time changes" must be submitted in writing. First Student must consult with KIPP "as to stops or portions of routes that [First Student] considers to be a safety concern due to traffic patterns or configurations." If First Student believes a "stop or route presents an unacceptable safety risk to [First Student's] property or students, [First Student] may reject the stop or route portion and provide [KIPP] with alternative designations by written notice." KIPP's RFP further requires First Student to provide a "[m]ethodology to insure [sic] drivers have a working knowledge of the routes and metropolitan St. Louis area" and "*ensure that each driver will have an updated route and/or student listing prior to making any run*." (Emphasis added.)

*Child Sustains Injuries*

In October 2019, Child was a nine-year-old fourth-grade student attending a KIPP elementary school. Before the 2019-2020 school year began, Mother contacted First Student to

4

request Child's school bus stop be moved closer to their residence, which was on Lalite Avenue, west of Goodfellow Boulevard. First Student referred Mother to KIPP to have the school bus stop changed. Mother contacted KIPP and received updated school bus stop information accommodating her request. Child's designated school bus stop was "GOODFELLOW BLVD & LALITE AVE (NW CRNR)" indicating the northwest corner of that intersection. Once Child alighted the school bus, he proceeded west on Lalite to his residence without having to cross Goodfellow, which was a busier street than Lalite. The updated ten-page computerized route sheet First Student prepared contained turn-by-turn driving instructions for both the morning and afternoon runs of Child's school bus route. For the afternoon run, First Student's route sheet directed its school bus drivers when reaching the southeast corner of Goodfellow and Lalite to make a series of turns so Child could be dropped off at the northwest corner of Goodfellow and Lalite. Starting at the school bus stop before Child's at the intersection of Lillian Avenue and Mimika Avenue, the directions on the route sheet reads:

> Turn Right on LILLIAN AVE
> Turn Right on GOODFELLOW BLVD
> Turn Left on LALITE AVE
> Turn Right on WILBORN DR OD
> Turn Right on GARESCHE AVE
> Turn Right on GOODFELLOW BLVD
> 4:55     GOODFELLOW BLVD & LALITE AVE (NW CRNR)

First Student's route sheet repeated this pattern of bypassing a southeast corner and making a series of turns to drop off four other students off at a northwest corner of Goodfellow during the afternoon run of Child's route. Beginning on the first day of school in August until October 22, 2019, First Student picked up and dropped off Child at the northwest corner of Goodfellow and Lalite.

On October 23, 2019, First Student assigned Richardson as the substitute driver for Child's afternoon school bus route. Richardson had not driven Child's route before that day. First Student

5

did not provide its updated software-generated route sheet with turn-by-turn directions to Richardson before driving the route. Instead, Richardson was given a handwritten list of intersections along the route. A copy of that list, set out below, was in evidence before the jury:

On the afternoon run, Richardson stopped the school bus at the southeast corner of Goodfellow and Lalite and had Child alight, which required Child to cross two lanes of traffic on Goodfellow. Child was visibly upset when he told Mother he had to cross Goodfellow to get home that afternoon.

On October 24, 2019, First Student again assigned Richardson as the substitute driver for Child's afternoon school bus route. As the day before, Richardson was not provided a copy of the updated route sheet. In the video recording obtained from the school bus, Richardson said, "I don't know how I remember these routes." As Richardson approached the southeast corner of Goodfellow and Lalite, she stopped the school bus, put out the stop arm, activated her lights, and opened the door. The video shows Child darting down the school bus stairs and running around to

the front of the school bus. Almost immediately, a car stopped behind the school bus moved to pass the school bus on the left driver's side. Richardson sounded her horn multiple times and shouted, but the car struck Child and fled from the scene. The passing car's driver was never identified or apprehended. The video shows Child limping as he returned to board the school bus.

Child suffered a right ankle sprain and a left ankle fracture. Child's left ankle required surgery to place pins for stabilization, which were surgically removed later. Child required physical therapy. Child also underwent skin graft surgery to alleviate pain at the surgical scar site, which improved but remains sensitive and requires the site to be wrapped for Child to be comfortable. After the incident, Child went to therapy as he encountered emotional difficulty crossing streets, walking in parking lots with moving cars, and riding the bus to and from school.

*Child's Negligence Claims*

Mother, as Child's next friend, sued Defendants for negligence. In Count I, Child alleged Richardson was negligent for failing to drop off Child at the northwest corner of Goodfellow and Lalite, which was his designated stop on the route sheet. In Count II, Child alleged First Student was vicariously liable for Richardson's actions because she was working in the course and scope of her employment at the time of the incident. Additionally, Count II alleged First Student was negligent for failing to provide Richardson with a copy of the software-generated route sheet, not informing her the route sheet stated Child's school bus stop was at the northwest corner or his home was located west of Goodfellow. In Count III, Child alleged negligence *per se* against Defendants for violating state law prohibiting students from crossing more than two lanes of traffic and a state regulation requiring a school bus route to return students to a designated point after

7

school.[3] First Student admitted Richardson acted as its employee at the time of the incident but denied committing any negligent conduct.

*Trial*

When viewing the trial testimony in the light most favorable to the verdict in Child's favor, the jury heard Mother's testimony, viewed Child's videotaped deposition, and read portions of Child's medical records describing his physical and mental injuries. The jury also had before it the software-generated route sheet, the handwritten list of intersections, the bus contract, KIPP's RFP, the training manual, and the school bus video recording depicting Richardson's actions, Child unloading from the school bus, and the car passing driving on the school bus's left driver's side before it struck Child.

First Student's District Manager ("Manager"), who oversees training, safety, and day-to-day operations, testified. Manager testified First Student was responsible for routing but KIPP had to approve the designated stops. Manager explained how First Student's routing software contained stops in existence for "decades," but First Student examined the intersections for accessibility and "hazards at the stop." Manager stated safety was a consideration when the route sheet drop-off locations were created. Manager acknowledged parts of Child's school bus route required the driver to pass through an intersection but then circle back or take an alternate route to return to the intersection to reach a designated stop. Manager agreed "children can be injured if they're dropped off at a different location than they should be." Manager admitted First Student expected its drivers "to be highly aware" of danger from passing cars on the school bus's left side. Manager testified Child had to walk through at least one danger zone when Richardson dropped him off at the southeast corner of Goodfellow and Lalite.

---

[3] At the close of all evidence, the circuit court sustained First Student's motion for directed verdict on any submission of negligence *per se* under Count III.

Manager testified its drivers were not required to follow the route sheet's turn-by-turn directions. Manager conceded Richardson did not follow the route sheet when Child was struck but explained the "intersection" of Goodfellow and Lalite was the stop and the northwest corner designation on the route sheet was "meaningless" because any corner at that intersection was safe. Manager testified the route sheet stated northwest corner for the afternoon run not because of safety reasons but because the routing software "replicates what happens in the morning" by taking "the stops and revers[ing] them." Manager further conceded First Student did not give Richardson a copy of the route sheet, inform her the route sheet stated Child's designated stop was at the northwest corner, or tell her Child lived west of Goodfellow. Instead, First Student provided Richardson with a list of intersections because she was "very familiar with the route," and she was not provided corner information because "she's an experienced driver and she knows the rules of the road."

KIPP's vice president of finance ("Vice President") testified about KIPP's expectations regarding First Student's school bus transportation services. Vice President testified First Student was responsible for the routing and stop location and/or time changes were required to be in writing. Vice President stated KIPP did not require First Student to design routes so students would not have to cross the street but believed the "safer the better" was warranted when choosing a specific drop-off point at an intersection. Vice President testified he was surprised to hear First Student did not provide a substitute driver with a route sheet and a student was not dropped off at a designated stop because failure to follow the route sheet did not meet KIPP's expectations.

Defendants moved for a directed verdict on Counts I and II at both the close of Child's evidence and at the close of all evidence, which the circuit court overruled. The jury received two verdict directors. Jury Instruction No. 7 stated:

9

Your verdict must be for [Child] and against . . . Richardson and First Student, Inc. if you believe:

First, [Child] was not dropped off at the northwest corner of Goodfellow and Lalite on October 24, 2019; and

Second, the southeast corner of Goodfellow and Lalite was not reasonably safe; and

Third, Defendants were thereby negligent; and

Fourth, such negligence directly caused or directly contributed to cause damage to [Child].

The term "negligent" or "negligence" as used in this instruction means the failure to use that degree of care that a very careful person would use under the same or similar circumstances.

Jury Instruction No. 8 stated:

Your verdict must be for [Child] and against [First Student] if you believe:

First, either:

First Student, Inc. did not provide . . . Richardson with a copy of [t]he [r]oute [s]heet on or prior to October 24, 2019; or

First Student, Inc. did not tell . . . Richardson that [t]he [r]oute [s]heet stated "NW CRNR" next to "GOODFELLOW BLVD & LALITE AVE" on or prior to October 24, 2019; or

First Student, Inc. did not tell . . . Richardson that [Child's] grandmother's house was located on Lalite Ave. west of Goodfellow on or prior to October 24, 2019; and

Second, Defendant First Student Inc. in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to [Child].

The term "negligent" or "negligence" as used in this instruction means the failure to use that degree of care that a very careful person would use under the same or similar circumstances.

10

The jury returned a verdict in Defendants' favor and against Child under Instruction No. 7. The jury returned a verdict in Child's favor and against First Student under Instruction No. 8 and awarded Child $1.3 million in damages. First Student moved for JNOV, which was overruled. First Student appeals.

**Standard of Review**

"The standard for reviewing a denied motion for JNOV is essentially the same as for reviewing the denial of a motion for directed verdict." *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 652 (Mo. banc 2019) (quoting *Sanders v. Ahmed*, 364 S.W.3d 195, 208 (Mo. banc 2012)). "A case may not be submitted unless legal and substantial evidence supports each fact essential to liability." *Id.* "Substantial evidence is evidence that 'has probative force upon the issues, and from which the trier of fact can reasonably decide the case.'" *Brock v. Dunne*, 637 S.W.3d 22, 26 (Mo. banc 2021) (quoting *Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 814 (Mo. banc 2003)). To determine whether the evidence was sufficient, this "Court views all evidence in the light most favorable to the jury's verdict and draws all reasonable inferences in the plaintiff's favor." *Tharp*, 587 S.W.3d at 652. "Conflicting evidence and inferences are disregarded." *Robinson v. Langenbach*, 599 S.W.3d 167, 176 (Mo. banc 2020). "Whether the plaintiff made a submissible case is a question of law that this Court reviews *de novo*." *Brock*, 637 S.W.3d at 26–27 (quoting *Newsome v. Kan. City, Mo. Sch. Dist.*, 520 S.W.3d 769, 775 (Mo. banc 2017)). "This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 769 (Mo. banc 2010). "A JNOV is a drastic action that can only be granted if reasonable persons cannot differ on the disposition of the case." *Arkansas-Missouri Forest Prods., LLC v. Lerner*, 486 S.W.3d 438, 447 (Mo. App. E.D. 2016).

11

**Discussion**

The jury awarded Child $1.3 million in damages on Instruction No. 8, which forms the basis of the points raised in First Student's appeal. First Student's first three points on appeal are premised on the theory its "only" duty was to ensure Child alighted at a reasonably safe place. Thus, First Student's points will be addressed out of order. This Court will address Points III and IV together, then Points I and II separately.

*Points III & IV: Instruction No. 8 Negligence Claim*

*Party Positions*

In Point III, First Student argues the circuit court erred in overruling its JNOV motion regarding its direct negligence because Instruction No. 8 improperly submitted to the jury purely evidentiary details while omitting the "ultimate issue" of whether First Student dropped off Child at a reasonably safe place. Child contends the circuit court properly overruled First Student's JNOV motion because Instruction No. 8 correctly instructed the jury as to First Student's direct negligence, which was not confined merely to the duty of whether Child was dropped off at a reasonably safe place.

In Point IV, First Student argues the circuit court erred in overruling its JNOV motion regarding its direct negligence because the passing car driver's criminal conduct was an intervening cause breaking the causal connection between Child's injuries and First Student's negligence. First Student maintains the passing car driver's criminal actions were unforeseeable. First Student contends the intersection of Goodfellow and Lalite was safe for students regardless of which corner Child alighted from the school bus. Child argues the circuit court properly overruled First Student's JNOV motion because the jury heard and rejected evidence the passing car's driver was the only party responsible for Child's injuries. Child further argues the passing

12

car driver's conduct cannot be considered an independent, intervening cause when the conduct is a foreseeable, natural product of First Student's original negligence in failing to provide Richardson with the route sheet and failing to inform her Child's designated school bus stop was the northwest corner of the intersection.

*Analysis*

To prevail on a negligence claim, the plaintiff must establish (1) the defendant owed a duty to him or her; (2) the defendant breached that duty; (3) causation; and (4) "injury" or "actual damages." *Payne v. Fiesta Corp.*, 543 S.W.3d 109, 118 (Mo. App. E.D. 2018) (first quoting *Peters v. Wady Indus., Inc.*, 489 S.W.3d 784, 793 (Mo. banc 2016); then quoting *Friday v. McClure*, 536 S.W.3d 235, 239 (Mo. App. W.D. 2017)).

*A. Duty*

"Whether a duty exists is a question of law" to be decided by the court. *Like ex rel. Like v. Glaze*, 126 S.W.3d 783, 785 (Mo. App. E.D. 2004); *see also Taticek v. Homefield Gardens Condo. Ass'n*, 502 S.W.3d 645, 648 (Mo. App. E.D. 2016). "[W]hether a duty exists is determined on a case by case basis." *Frye v. Monarch Title of N. Mo.*, 565 S.W.3d 693, 699 (Mo. App. W.D. 2018) (citing *Sun Aviation, Inc. v. L-3 Comms. Avionics Sys., Inc.*, 533 S.W.3d 720, 727 (Mo. banc 2017)). "Factual circumstances surrounding the relative status of the parties and other factual circumstances peculiar to such particular case dictates the acts/omissions which may be required under the standard of reasonable care." *Id.* (quoting *Am. Mortg. Inv. Co. v. Hardin-Stockton Corp.*, 671 S.W.2d 283, 292–93 (Mo. App. W.D. 1984)).

First Student alleges its *only* duty was to ensure Child alighted in a reasonably safe place. First Student is correct this may be *one* of its duties, as stated in Instruction No. 7. *See Plummer v. Dace*, 818 S.W.2d 317, 321 (Mo. App. E.D. 1991). But, a legal duty may arise from other sources:

(1) it may be prescribed by the legislature; (2) it may arise because the common
law imposes a duty based on the relationship between the parties, or because under
a particular set of circumstances a party must exercise due care to avoid foreseeable
injury; or (3) it may arise because a party has assumed a duty by contract or conduct.

*Scales v. Whitaker*, 615 S.W.3d 425, 431 (Mo. App. E.D. 2020). "While the issue of whether a

duty exists is a question for the court, conclusions about the particular facts of the case are an issue

for the jury." *Hackmann v. Mo. Am. Water Co.*, 308 S.W.3d 237, 240 (Mo. App. E.D. 2009) (citing

*Lumbermens Mut. Cas. Co. v. Thornton*, 92 S.W.3d 259, 267 (Mo. App. W.D. 2002)).

Here, First Student's independent duty as posited in Instruction No. 8 arises from assuming

a duty by the bus contract, assuming a duty by conduct, and/or given the particular set of

circumstances in this case, which required First Student to exercise due care to avoid foreseeable

injury. *Scales*, 615 S.W.3d 431. This Court will address each duty theory in turn.[4]

### 1. First Student Assumed a Duty by Contract

A legal duty "may arise because a party has assumed a duty by contract or agreement

whether written or oral." *Hackmann*, 308 S.W.3d at 240. Here, a legal duty arose between First

Student and Child under the school bus contract.[5] KIPP contracted with First Student to provide

pupil transportation services. The bus contract required First Student to "fulfill [KIPP's] needs for

transportation services as described in the [RFP] . . . ." First Student was contractually responsible

for planning routes and stops. Further, the RFP states First Student "shall ensure that each driver

---

[4] Agreeing with First Student, the only duty is alighting at a reasonably safe place, the dissenting opinion does not address any of this opinion's analysis regarding why First Student's independent duty arises.

[5] To the extent First Student argues Child is not a party to the contract, "[a]lthough a contract may not generally be the source of a tort duty by one of the contract parties to a third party, Missouri law recognizes an exception in situations involving the safety of other persons." *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 262 (Mo. banc 2002); *see also State ex rel. Tyler Techs., Inc. v. Chamberlain*, 679 S.W.3d 474, 478 (Mo. banc 2023); Restatement (Second) of Torts, § 324A. "The contract is of interest . . . because it shows what defendant undertook to do." *L.A.C.*, 75 S.W.3d at 262 (quoting *Wolfmeyer v. Otis Elevator Co.*, 262 S.W.2d 18, 21 (Mo. 1953)). "Some of the things defendant undertook to do were such as might affect the safety of third persons, including plaintiff." *Id.* "And in doing the things which the defendant knew or should have known affecting the safety of third persons, defendant had a duty to such third persons to do carefully what it undertook to do." *Id.*

will have an updated route and/or student listing prior to making any run" and must provide a "[m]ethodology to insure [sic] drivers have a working knowledge of the routes and metropolitan St. Louis area." Additionally, any stop location changes had to be in writing. Hence, First Student had a contractual duty to provide Richardson with the designated route, stops, and/or student listing before making her run. *See generally Hackmann*, 308 S.W.3d at 240. This contractual duty was submitted in Instruction No. 8, listing the information First Student had in its possession but was alleged to have not provided to Richardson before making her run despite the contractual duty to provide sufficient information as to Child's designated school bus drop off location, *i.e.*, an updated route and/or student listing.

### 2. First Student Assumed a Duty by Conduct

In addition to these contractual provisions, Missouri Courts recognize "[i]f a defendant assumes a duty, by contract or by conduct, he can be held liable for injuries caused by the unsafe performance of that assumed duty." *Scales*, 615 S.W.3d at 438 (quoting *Bowan ex rel. Bowan v. Express Med. Transporters, Inc.*, 135 S.W.3d 452, 457 (Mo. App. E.D. 2004)). Missouri Courts have adopted Restatement (Second) of Torts section 323 (1965), which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

*Junior Coll. Dist. of St. Louis v. City of St. Louis*, 149 S.W.3d 442, 451 (Mo. banc 2004). To succeed on a claim under Restatement section 323, a plaintiff must "prove that [the defendant] undertook 'to render services' to [the plaintiff] and that [the defendant] should recognize these services as 'necessary for the protection of' [the plaintiff]." *Taticek*, 502 S.W.3d at 651 (quoting

15

*Green v. Unity Sch. Of Christianity*, 991 S.W.2d 201, 205 (Mo. App. W.D. 1999)). "Undertake" in this context means "to take upon oneself; to set about." *Id.* (quoting *Green*, 991 S.W.2d at 206).

In *Taticek*, a condominium complex resident sued the condominium association and management company for injuries she suffered when another resident's dog attacked her while she was in the complex's common area. *Id.* at 647. This Court noted the condominium association created rules and regulations for the residents' "health, comfort, safety, and welfare." *Id.* at 652. This Court further noted the condominium association enforced these rules through inspections and with the help of the condominium management company. *Id.* Accordingly, this Court held the condominium association and management company undertook "to render services to another which he should recognize as necessary for the protection of the other's person or things[.]" *Id.* In other words, this Court held the condominium association owed a duty to the condominium residents to enforce its safety rules and regulations based on its conduct. *Id.*

Here, the issue is whether First Student undertook to render services to Child, which it should recognize as necessary for Child's protection. *Id.* First Student provided student transportation services to KIPP. First Student agreed in the RFP it would "comply with" the expectation "[t]he safety of [the] students [being their] primary priority." First Student also agreed it would "be primarily responsible for planning all [school bus] routes, stops and schedules in coordination with, and based upon, [KIPP] specifications." To fulfill this undertaking, First Student used software to create school bus routes and generate school bus stops for the students. Manager testified this route sheet was "for the driver[s]." The route sheet provided the school bus drivers with turn-by-turn directions to each designated bus stop, including specified corners of the intersections, a list of which students are picked up and dropped off at each school bus stop, and the grade levels of each student bus rider. Beyond simple utility, the route sheet itself is critically

16

important because in producing this route sheet, Manager agreed safety is something the routing department considers. For example, the routing software "would have [the] information" to know which side of streets the students live, and specifically which side of Goodfellow Child's house on Lalite is located.[6] The route sheet specifically designated Child's bus stop as the northwest corner of Lalite and Goodfellow. The route sheet required the school bus driver to make a series of turns to return to the intersection of Lalite and Goodfellow at the northwest corner. Mother testified Child's regular bus driver picked him up and dropped him off at the northwest corner of Lalite and Goodfellow.[7]

School bus drivers knowing which side of the street a student lives is important because they must follow certain procedures set out in their training and mandated by state regulations if a child must cross a street. For example, school bus drivers are required to "[c]heck traffic in front *and rear* of the school bus before [giving] the students a hand signal that it is okay to cross the road." 5 CSR 30-261.010(3)(A)2.H (emphasis added). School bus drivers are instructed to "train students" to "not approach the school bus until given a signal and to check traffic before crossing the roadway." *Id*. School bus drivers are also mandated to "require students who must cross the roadway after leaving the bus . . . to cross a minimum of ten feet (10') in front of the bus and only upon a signal given by the driver . . . ." 5 CSR 30-261.010(3)(A)2.I. The route sheet is also critical

---

[6] There is a reasonable inference the other children dropped off on the northwest corners of Goodfellow also lived west of Goodfellow and were dropped off there for safety reasons. Because, otherwise, there is no reason for First Student to single these children out for a series of turns to place them on a northwest corner. Manager's contention the reason certain corners are designated is because the stops on the route sheet have been in existence for "[d]ecades" and because Goodfellow had four lanes of traffic students were not allowed to cross. Goodfellow is now a two-lane road upon which students may cross, but because the stops were "prestored" in the system, the route sheet still designates the stop at the northwest corner. First Student's explanation is unconvincing given at the beginning of the school year Mother requested Child's bus stop be changed, and the stop was deliberately changed to the northwest corner of Goodfellow and Lalite.

[7] Although Manager testified any corner in the intersection, rather than the designated corner on the route sheet, was an acceptable bus stop, the issue of where Child's *designated* school bus stop was located was an issue of fact for the jury to decide. *Hackmann*, 308 S.W.3d at 240.

for school bus drivers because it provides the grade level of the students riding the school bus. KIPP, as provided in the RFP, requires kindergarten and first-grade students "to be picked up at their stop by an authorized adult for release" . . . students "who are not picked up at their stop are to be returned to a location designated by [KIPP]," and First Student must "promptly notify the school, and the student's parents." Additionally, Manager herself testified "the students are not, cannot be required to cross four lanes of traffic."

Nonetheless, Manager contends when a substitute bus driver "is very familiar with the route," First Student "just give[s] them the intersections that the students go to." Despite the handwritten list of intersections being incorrect—containing stops not on the route sheet, excluding certain stops,[8] and not indicating which corner the students were to be dropped off at—Manager maintained Richardson did not need the route sheet because she was "very familiar" with the route. Additionally, despite testifying Richardson "didn't know the students" and was "unfamiliar with the students,"[9] Manager maintained Richardson only needed the intersections because she "knows what is appropriate and safe to drop a student off." Yet, to know what is appropriate and safe to drop off a student, a school bus driver must have certain information as to each student, such as the route sheet generated by First Student's software and created "for the driver[s]."

Accordingly, First Student undertook "to render services to another which [it] should recognize as necessary for the protection of the other's person or things[.]" *Taticek*, 502 S.W.3d at 651. Providing First Student school bus drivers sufficient information as to its students' designated school bus stops, such as via the route sheet, was necessary to protect Child from injury.

---

[8] Even though it is listed on the handwritten list of intersections, Manager admitted Goodfellow and Sherry is not a stop on the route sheet. Additionally, when asked if she could find Goodfellow and Laura on the handwritten list of intersections, Manager responded "[I]t is not."

[9] This testimony was in response to Richardson's statements heard via the school bus video recording where Richardson asserted she did not "know how she remember[ed] this route" and asked who Child was.

Hence, Instruction No. 8 posited First Student undertook a duty to Child to ensure his school bus driver had sufficient information as to his designated bus stop.

3. First Student Had a Duty to Exercise Due Care to Ensure Child's Safety

Finally, a legal duty "may arise because under a particular set of circumstances an actor must exercise due care to avoid foreseeable injury." *Hackmann*, 308 S.W.3d at 240. First Student's and the dissenting opinion's proposition this Court is foreclosed from examining whether an additional duty exists construes legal duty jurisprudence too narrowly. The law does not foreclose courts from finding other duties arising out of a particular set of circumstances. *Id.*; *see generally Hoffman v. Union Elec. Co.*, 176 S.W.3d 706 (Mo. banc 2005) (analyzing whether Union Electric had a duty to inform emergency personnel a power line was de-energized). Instruction No. 8 details a separate theory of negligent liability: whether First Student had a duty to provide Child's school bus driver with sufficient information as to Child's designated school bus drop-off location to avoid a foreseeable injury.

"This Court's determination of whether a duty exists in a particular case depends on several public policy considerations including 'the foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against it and the consequences of placing that burden on defendant.'" *Scales*, 615 S.W.3d at 436 (quoting *Hallquist v. Midden*, 196 S.W.3d 601, 604 (Mo. App. E.D. 2006)). An additional public policy consideration is whether a defendant has "some right or obligation to control the activity that presents the danger of injury." *Id.* (quoting *Burrell ex rel. Schatz v. O'Reilly Auto., Inc.*, 175 S.W.3d 642, 656 (Mo. App. S.D. 2005)).

a. Foreseeability & Likelihood of Injury

"Foreseeability is defined 'as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it.'" *Id.* (quoting

*Hallquist*, 196 S.W.3d at 604). "A mere probability is insufficient; rather, there must be the existence of a probability which would cause a reasonable person to take precautions to avoid it." *Id.* (quoting *Hallquist*, 196 S.W.3d at 604).

The issue here is the foreseeability and likelihood of Child, a nine-year-old fourth grader, being struck by a passing car while crossing the street when his school bus driver was not provided with sufficient information to drop him off at his *designated* school bus stop, which would not have required him to cross this street or enter a known "danger zone" for passing cars. First Student is responsible for creating school bus routes, determining the designated school bus stop location for every child it transports, and managing its school bus drivers. Moreover, First Student must follow all state and local laws and regulations. These state laws and regulations anticipate and seek to prevent the foreseeable and likely tragedy of a child being struck by a passing car by establishing criteria in determining school bus routes and school bus stops, regulating school buses and school bus driver operations, and mandating motorists take certain action when approaching a school bus under the penalty of law.

For example, school bus drivers are required to "[c]heck traffic in front *and rear* of the school bus before [giving] the students a hand signal that it is okay to cross the road." 5 CSR 30-261.010(3)(A)2.H (emphasis added). School bus drivers are instructed to "train students" to "not approach the school bus until given a signal and to check traffic before crossing the roadway." *Id.* School bus drivers are also mandated to "require students who must cross the roadway after leaving the bus . . . to cross a minimum of ten feet (10') in front of the bus and only upon a signal given by the driver . . . ." 5 CSR 30-261.010(3)(A)2.I.

Additionally, Missouri regulations require certain criteria to be considered in determining a child's school bus route and bus stop. *See* 5 CSR 30-261.010(4)(B). The *location of a child's*

*residence*, along with the grade and age of the child being transported, are criteria for determining a child's school bus route. 5 CSR 30-261.010(4)(B)1.A.-B (emphasis added). Other safety concerns to consider when establishing school bus routes are: "the general safety of all routes in relation to hazards such as . . . intersections," "the general safety of loading and unloading stops in relation to the visibility of approaching motorists," "[w]alking distance to the bus stop in relation to the age of the pupil," and the "[w]alking route safety to loading stop, from unloading, and loading zones . . . ." 5 CSR 30-261.010(4)(B)2. In creating these laws and regulations, the State of Missouri is foreseeing the danger to children and taking steps to ensure their safety because "[a] child on or near a roadway is almost devoid of any real appreciation of danger, and their thoughtless and impulsive acts are to be expected and guarded against." *Plummer*, 818 S.W.2d at 321 (quoting *Huckstep v. Richards*, 609 S.W.2d 731, 733 (Mo. App. S.D. 1988)).

Beyond Missouri's laws and regulations foreseeing injury, First Student itself is aware of the likelihood and foreseeability of a child being struck by a passing car when alighting from a school bus. First Student's school bus driver training manual explains, "[d]anger zones are areas outside the bus where children are in the most danger of being hit . . . by another vehicle" and emphasizes "the area to the left of the bus is always considered dangerous because of passing cars." Manager also agreed in her testimony the information about these "danger zones" is something First Student expects its drivers to know. Further, Missouri caselaw recognizes, "this zone of protection continues until the child 'has crossed any immediate road and is in a place of safety in a direction towards [his or her] home.'" *Farm Bureau Town & Country Ins. Co of Mo. v. Schmidt*, 751 S.W.2d 375, 375–76 (Mo. banc 1988) (quoting *Ga. Farm Bureau Mut. Ins. Co. v. Greene*, 329 S.E.2d 204, 208 (Ga. Ct. App. 1985)).

Such safety concerns are considered when generating First Student's school bus route sheet. Manager testified these bus route sheets are "for the driver." Manager testified when generating the route sheet, First Student used routing software, which considers safety. For example, the routing software "would have [the] information" to know which side of Goodfellow Child's house on Lalite is located. The route sheet designates the northwest corner of Lalite and Goodfellow as Child's bus stop location. The route sheet requires the school bus driver to make a series of turns on the route to return to the intersection of Lalite and Goodfellow at the northwest corner. Manager recognized parts of the route directed the bus driver to pass through an intersection, but then circle back or take an alternate route to get to a specific corner of the intersection to drop off a child. Manager conceded Child would not have to cross Goodfellow, avoiding danger from passing cars on this street, but would still have to cross Lalite if a bus driver properly followed the route sheet directions. Nonetheless, Manager acknowledged "Goodfellow is busier than Lalite," and agreed there is no crosswalk at Goodfellow and Lalite, as demonstrated by the photographic exhibits. Finally, Manager agreed in her testimony "children can be injured if they're dropped off at a different location than they should be."

Thus, Child's injuries were foreseeable and likely when First Student failed to provide its school bus driver, Richardson, with sufficient information to drop off Child at his *designated* school bus stop, requiring him to cross the street, pass through a danger zone, and ultimately be struck by a passing car.

### b. Magnitude & Consequences of Burden

As explained, the bus contract, state law, state regulation, and its own training manual dictate First Student considers safety when generating school bus routes and stops and require it to sufficiently guard against the danger of children being struck by passing cars. *See generally*

22

§ 304.050; 5 CSR 30-261.010.[10] Moreover, First Student was paid to and already produced the route sheet specifying certain intersection corners as the designated bus stops for students, including Child, which considered the location of the student's residence and certain safety hazards, such as intersections. Thus, the magnitude and consequences of the burden to provide school bus drivers with sufficient information regarding a child's bus stop are already considered by law and performed under First Student's policies and practices. Here, the designated route existed. The burden to provide the substitute driver of a copy of it was minimal.

*c. Right or Obligation to Control Activity*

Whether a defendant has "some right or obligation to control the activity that presents the danger of injury" is an additional public policy consideration in determining whether First Student owes Child a legal duty. *Scales*, 615 S.W.3d at 436 (quoting *Burrell ex rel. Schatz*, 175 S.W.3d at 656). First Student has almost complete control over children loading and unloading school buses, including the location from which children load and unload their school buses. Additionally, by its own school bus contract and RFP, First Student is "primarily responsible for planning all routes, stops and schedules in coordination with, and based upon [KIPP] specifications." First Student is also required to ensure its school "bus stops safely comply with applicable Missouri laws and DESE regulations." *See generally* 5 CSR 30-261.010(4)(B). It is First Student's responsibility "to maintain, update, manage and provide all needed documentation to [KIPP] as necessary for compliance with Missouri DESE, and local district rules and regulation." Moreover, First Student is required to "ensure that each [school bus] driver will have an updated route and/or student listing prior to making any run." Thus, First Student retains almost complete control of informing its school bus drivers to ensure children are dropped off at their designated school bus stops.

---

[10] All statutory references are to RSMo 2016, unless otherwise indicated.

*d. Legal Duty Under Particular Circumstances in Sum*

"The duty of care where children are involved always requires more vigilance and caution than might be required where adults are concerned." *Plummer*, 818 S.W.2d at 321 (citing *Smith v. Archbishop of St. Louis*, 632 S.W.2d 516, 522 (Mo. App. E.D. 1982)). "This is particularly true where the party responsible for the child is or should be aware of a particularly dangerous situation." *Id.* Accordingly, under these circumstances, this Court finds First Student had a legal duty to provide Child's school bus driver, Richardson, with sufficient information as to Child's designated school bus stop location given: (1) Child's injuries were likely and foreseeable because his school bus driver was not provided with sufficient information to drop off Child at his designated school bus stop resulting in him crossing the street through a danger zone; (2) the magnitude and consequences of the burden to provide school bus drivers with sufficient information of a child's designated school bus stop are already contemplated by law and First Student's policies; and (3) First Student retains almost complete control over providing its school bus drivers with route information to ensure children are dropped off at their designated school bus stops.[11]

*e. Reasonably Safe Place Analysis is Inapplicable*

The dissenting opinion cites to five cases to support the contention "the only legal duty of a bus company to its passenger in a 'bus drop-off' case is to select and stop its bus at a place 'reasonably safe' for the passenger to alight": *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 307 (Mo. banc 1978); *Moore ex rel. Moore v. Bi-State Dev. Agency*, 87 S.W.3d 279, 293–94

---

[11] This Court is not making a broad public policy statement that all school bus companies must drop off all school children at a residential corner such that no child ever crosses through the danger zone for passing cars. That is not the duty we are examining or deciding. This opinion addresses the duty to inform drivers of existing designated drop-off locations for specific students, given their age and residential location. *See* 5 CSR 30-261.010(4)1.A-B. This Court only addresses the factual circumstances peculiar to this case. *Frye*, 565 S.W.3d at 699.

(Mo. App. E.D. 2002) (abrogated on other grounds by *Goldsby v. Lombardi*, 559 S.W.3d 878, 883 n.3 (Mo. banc 2018)); *Plummer v. Dace*, 818 S.W.2d 317, 320 (Mo. App. E.D. 1991); *Sanford v. Bi-State Dev. Agency*, 705 S.W.2d 572, 575 (Mo. App. E.D. 1986); *Goedecke v. Bi-State Dev. Agency of Missouri-Illinois*, 412 S.W.2d 189, 192 (Mo. App. 1967).[12] These cases address the duty common carriers owe to their passengers: a common carrier must "exercise the highest degree of care for its passengers," and this duty "continues at least until the passenger has been discharged at a reasonably safe place." *Plummer*, 818 S.W.2d 320; *see also Graeff*, 576 S.W.2d at 307; *Sanford*, 705 S.W.2d at 574–75; *Goedecke*, 412 S.W.2d at 192.[13] Contrary to the dissenting opinion's proposition, the rule itself determining what duty is owed is *not* invariably exclusive. Rather, the rule dictates common carriers owe this degree of care, or duty, to the passenger *until* they are dropped off at a reasonably safe place, and whether discharging the passenger at a reasonably safe place is the common carrier's only duty to that passenger is completely case specific. *Id.*

For example, in *Goedecke*, the Court addressed the latter scenario discussing the degree of care, *i.e.*, duties of common carriers "that use[] the public streets to discharge its passengers." 412 S.W.2d at 192. The Court noted "[s]ince carriers operating on public highways neither own nor control the highways, they are not responsible for the condition of landing areas—that is a municipal duty." *Id.* The Court held "[a]pplying these principles *to this case*, Bi-State's only duty was to select and stop its bus at a place reasonably safe for [the plaintiff] to alight." *Id.* (emphasis added). The Court further held "[u]nder the evidence *here*, the act of selecting and stopping the

---

[12] *Moore* is not addressed further because *Moore* applies Illinois negligence law and "decisions of other state courts are not binding on us." *State v. DeRoy*, 623 S.W.3d 778, 791 (Mo. App. E.D. 2021) (quoting *Doe v. Roman Cath. Diocese of St. Louis*, 311 S.W.3d 818, 823 (Mo. App. E.D. 2010)).

[13] This Court does not address whether school buses have a greater duty beyond just dropping a student off at a reasonably safe place given the different laws applicable to school buses because it is not an issue raised in this case.

bus at a safe place was a duty that Bi-State could fulfill only through the mind and body of its driver[.]" *Id.* (emphasis added).

Here, Instruction No. 8 is not about a defect in the street, nor if the bus stopped before or after such a defect; rather, it is about the independent failure of First Student to provide its bus driver with sufficient information as to Child's designated school bus drop off location. This designated spot was created by First Student using its software, which considered Child's safety, age, and residential location. These are details First Student was required, by contract and by law, to consider when planning routes and stops for students. Only First Student could provide this information to its school bus driver. First Student can accomplish its plan only if the school bus driver is given a copy of the detailed route it has created. Instruction No. 8 and the duty it submits is distinct from the duty submitted in Instruction No.7. Additionally, Instruction No. 7 does not preclude Instruction No. 8 because *Goedecke* does not state nor should it be read to preclude Child from alleging a separate, independent theory of negligence based solely on First Student's conduct. The Court in *Goedecke* limited its holding to its own facts and circumstances and to the claim raised because the plaintiff only sued based on Bi-State's alleged failure to provide her a safe place to alight and did not provide any evidence of other conduct by Bi-State relating to the bus passenger zone. *Id.* at 190, 192.

Moreover, the dissenting opinion's assertion "*Plummer* stands for the proposition that the duty owed to a student alighting from a school bus is to drop him or her off at a reasonably safe place" is misguided. The only claim remaining in *Plummer* was directed at the school bus driver alleging he was negligent in allowing the child "to exit the school bus at an unsafe place, at the wrong stop, and alone[.]" 818 S.W.2d at 318.[14] The *Plummer* Court emphasized "[w]hat is a

---

[14] In *Plummer*, a six-year-old student was dropped off by her school bus driver and the child was hit by a car while she was crossing the street. 818 S.W.2d at 318. Through her parents, the child sued the driver of the passing vehicle,

'reasonably safe place' is susceptible of widely divergent conclusions depending upon the circumstances of each case." 818 S.W.2d 320. Specifically, this Court noted "[t]he duty of care where children are involved always requires more vigilance and caution than might be required where adults are concerned" and "[t]his is particularly true where the party responsible for the child is or should be aware of a particularly dangerous situation." *Id.* at 321. "A child on or near a roadway is almost devoid of any real appreciation of danger, and their thoughtless and impulsive acts are to be expected and guarded against." *Id.* (quoting *Huckstep*, 609 S.W.2d at 733). "Applying these principles to the facts of *this case*" this Court held they were "unable to conclude as a matter of law that [the bus driver] provided a reasonably safe place for [the child] to alight from the bus." *Id.* (emphasis added).[15] "The mere fact that a six[-]year-old child was safe so long as she remained in the same position does not compel such a conclusion." *Id.* "That [the bus driver] should have anticipated some misfortune was likely to befall the little girl under these circumstances is at least a matter upon which reasonable minds could differ." *Id.* Thus, like in *Goedecke*, this Court in *Plummer*, does not state nor should it be read to preclude Child from alleging a separate, independent theory of negligence based solely on First Student's conduct, specifically conduct occurring well before Child alighted the bus.[16]

---

the bus driver, and the school district. *Id.* The claim between the driver and the child settled, and the claims against the school district were dismissed because the school district was protected under sovereign immunity. *Id.*

[15] The appeal in *Plummer* dealt with a circuit court granting a motion for summary judgment. 818 S.W.2d 321. This Court reversed the circuit court's grant of summary judgment in favor of the bus driver and remanded the case because there were still ultimate issues of material fact for the jury. *Id.* at 321–22.

[16] Factually, four of the cases are also distinct because they do not involve school buses; rather, they in involve Bi-State buses or a church bus. *Graeff*, 576 S.W.2d at 295 (Mo. banc 1978) (church bus); *Moore*, 87 S.W.3d at 284 (Bi-State bus); *Sanford*, 705 S.W.2d at 573 (Bi-State bus); *Goedecke*, 412 S.W.2d at 190 (Bi-State bus). This a distinction with a difference because Missouri law differentiates between school buses and common carrier buses, maintaining different requirements and rules for school bus transportation providers, school bus drivers, and civilians driving near school buses. *See, e.g.*, § 304.050 (listing rules applying to school buses, school bus drivers, and civilian drivers); § 304.060 (differentiating between common carrier buses and school buses); 5 CSR 30-261.010(3)(A)2.H (rule applying to school bus drivers); 5 CSR 30-261.010(3)(A)2.I (rule applying to school bus drivers).

*B. Breach*

Having found a duty to provide its drivers with sufficient information as to Child's designated drop-off location, this Court turns its analysis to breach. "[W]hether the duty that exists has been breached is a question of fact for exclusive resolution for the jury." *Hackmann*, 308 S.W.3d at 240 (quoting *Lumbermens Mut. Cas. Co.*, 92 S.W.3d at 266). Here, the jury determined under Instruction No. 8 First Student breached its duty to provide Richardson with sufficient information as to Child's designated school bus stop location. Under the standard of review, this Court need only examine whether Child presented a submissible case by offering evidence to support the element of breach. *Brock*, 637 S.W.3d at 26–27. To determine whether the evidence was sufficient, this "Court views all evidence in the light most favorable to the jury's verdict and draws all reasonable inferences in the plaintiff's favor." *Tharp*, 587 S.W.3d at 652. "Conflicting evidence and inferences are disregarded." *Robinson*, 599 S.W.3d at 176.

Mother testified Child's designated school bus stop was "GOODFELLOW BLVD & LALITE AVE (NW CRNR)" indicating the northwest corner of that intersection. Mother testified Child's regular school bus driver picked him up and dropped him off at the northwest corner of Goodfellow and Lalite each day until Richardson drove the afternoon route using the handwritten list of intersections which did not correspond in form or content to the software-generated, turn-by-turn driving instructions and dropped Child off at the southwest corner. Most importantly, the jury heard testimony from Manager, who conceded First Student did not give Richardson a copy of the route sheet, inform her the route sheet stated northwest corner, or tell her Child lived west of Goodfellow. Instead, First Student provided Richardson with a list of intersections because she was "very familiar with the route," and she was not provided corner information because "she's an experienced driver and she knows the rules of the road."

28

The jury was free to believe or disbelieve Manager's testimony about the sufficiency of the handwritten list of intersections. *Keveney v. Mo. Mil. Acad.*, 304 S.W.3d 98, 105 (Mo. banc 2010) (quoting *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578, 584 (Mo. App. W.D. 2002)) ("The jury is the sole judge of the credibility of witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony."). The jury was also free to believe Richardson's statement, "I don't know how I remember these routes," which contradicted Manager's testimony Richardson was "very familiar with the route." The jury heard testimony from Vice President, who stated he was surprised to hear First Student did not provide a substitute driver with a route sheet and a student was not dropped off at a designated stop because failure to follow the route sheet did not meet KIPP's expectations. The jury also had before it the school bus contract, KIPP's RFP, the handwritten list, the software-generated route sheet, and First Student's training manual.

Thus, under this Court's standard of review, Child presented a submissible case by offering evidence to support the element of breach. *Brock*, 637 S.W.3d at 26–27. There is sufficient evidence on the record to support the jury's determination First Student breached its duty to Child to provide Richardson with sufficient information as to Child's designated school bus stop location.

### C. Causation & Intervening Act

"To prove a causal connection between the alleged negligent act and injury, the plaintiff must show both causation in fact and proximate cause." *Kottman v. Mo. State Fair*, 451 S.W.3d 331, 334 (Mo. App. W.D. 2014). "The 'but for' test is applied to determine whether causation in fact has been established." *Id.* (quoting *Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc.*, 402 S.W.3d 586, 599 (Mo. App. W.D. 2013)). "The 'but for' test for causation provides that the

defendant's conduct is a cause of the event if the event would not have occurred 'but for' that conduct." *Id.* (quoting *Freight House Lofts*, 402 S.W.3d at 599). "The trier of fact normally decides causation, especially where reasonable minds could differ as to causation on the facts of the case." *Bruckerhoff v. City of Perryville*, 681 S.W.3d 303, 308 (Mo. App. E.D. 2023) (quoting *Kraus v. Hy-Vee, Inc.*, 147 S.W.3d 907, 918 (Mo. App. W.D. 2004)). "Causation of fact is an issue for the jury if sufficient evidence is presented from which the jury could reasonably find that the plaintiff's injury was the direct result of the defendant's negligence." *Id.* at 334–35 (quoting *Freight House Lofts*, 402 S.W.3d at 599).

"Whether proximate cause exists is usually a jury question; however, a court properly interposes its judgment in this determination when the evidence reveals the existence of an intervening cause that eclipses the role the defendant's conduct played in the plaintiff's injury." *Rayman v. Abbott Ambulance, Inc.*, 546 S.W.3d 12, 18 (Mo. App. E.D. 2018) (quoting *Heffernan v. Reinhold*, 73 S.W.3d 659, 664 (Mo. App. E.D. 2002)). "The act must be a 'new and independent force which so interrupts the chain of events that it becomes the responsible, direct, proximate and immediate cause of the injury.'" *Id.* (quoting *Lewis v. Biegel*, 204 S.W.3d 354, 363 (Mo. App. W.D. 2006)). In other words, "[n]egligent conduct ceases to be the proximate cause of an injury only when the intervening act constitutes such a new and independent cause that it interrupts, rather than contributes to, the chain of events set in motion by the original negligence." *Plummer*, 818 S.W.2d at 321.

In Point IV, First Student argues, and the dissenting opinion agrees, the passing car's actions constituted an intervening and superseding cause because they were criminal and unforeseeable. However, a "defendant is not invariably excused from liability when the chain of causation includes a criminal act." *Finocchio v. Mahler*, 37 S.W.3d 300, 303 (Mo. App. E.D.

2000). "Conduct may not be considered an independent, intervening cause where such action is 'a foreseeable, natural product of the original negligence.'" *Plummer*, 818 S.W.2d at 321 (quoting *Jordan v. Gen. Growth Dev. Corp.*, 675 S.W.2d 901, 903 (Mo. App. W.D. 1984)). "Where the likelihood of the intervening act is one of the hazards which rendered the original actor's conduct negligent, he cannot be insulated from the consequences of the chain of events he set in motion." *Id.* at 321–22 (citing *St. John Bank & Trust Co. v. City of St. John*, 679 S.W.2d 399, 403 (Mo. App. E.D. 1984)).

"[I]t is not unexpected or freakish that a driver might disregard traffic laws and strike a pedestrian." *Thompson v. City of St. Joseph*, 597 S.W.3d 687, 694 (Mo. App. W.D. 2019) (quoting *Britton v. City of St. Louis*, 552 S.W.3d 139, 142 (Mo. App. E.D. 2018)). Here, any passing car would necessarily do so in violation of section 304.050.1(1), which requires motorists to stop.[17] First Student specifically emphasized in its training manual "the area to the left of the bus is *always* considered dangerous because of *passing cars*." (Emphasis added). First Student's training manual defines the area to the left of the school bus as a danger zone, *i.e.*, an area "outside the bus where children are in the most danger of being hit, either by another vehicle or their own bus." Manager admitted First Student expected its drivers "to be highly aware" of danger from passing cars on the school bus's left side. Moreover, state law and regulations address vehicles passing school buses and the dangers for children around school buses. *See, e.g.*, § 304.050. Additionally, because passing cars are a hazard, school bus drivers are required to "[c]heck traffic in front and rear of the school bus before [giving] the students a hand signal that it is okay to cross the road." 5 CSR 30-261.010(3)(A)2.H. School bus drivers are instructed to "train students" to "not approach the school

---

[17] This statute specifically requires motorists to stop for school buses while children are loading and unloading. § 304.050.1(1). This statute also requires school buses to deploy signaling devices to indicate students are loading or unloading. § 304.050.4. Moreover, the legislature dedicated a statute "in commemoration of Jessica Leicht and all other Missouri schoolchildren who have been injured or killed during the operation of a school bus." § 304.050.3.

31

bus until given a signal and to check traffic before crossing the roadway" and "require students who must cross the roadway after leaving the bus . . . to cross a minimum of ten feet (10') in front of the bus and only upon a signal given by the driver . . . ." 5 CSR 30-261.010(3)(A)2.I.[18] State laws exist to protect children from this foreseeable criminal danger. Thus, under these circumstances, the passing car disregarding the school bus stop signals and passing the school bus was foreseeable and did not "eclipse[] the role [First Student's] conduct played in the [Child's] injury." *Wilmes v. Consumers Oil Co. of Maryville*, 473 S.W.3d 705, 724 (Mo. App. W.D. 2015).

Because causation of fact is an issue for the jury, under the standard of review, this Court need only determine whether Child presented sufficient evidence "from which the jury could reasonably find" Child's injuries were "the direct result of [First Student's] negligence." *Kottman*, 451 S.W.3d at 334 (quoting *Freight House Lofts*, 402 S.W.3d at 599). The jury heard testimony from Mother stating Child's designated school bus stop was "GOODFELLOW BLVD & LALITE AVE (NW CRNR)" indicating the northwest corner of that intersection. The record shows beginning on the first day of school in August until October 22, 2019, First Student picked up and dropped off Child at the northwest corner of Goodfellow and Lalite without incident and without Child having to cross Goodfellow to return home. The jury was shown the ten-page route sheet First Student prepared containing turn-by-turn driving instructions for both the morning and afternoon runs of Child's school bus route. The jury was also shown the handwritten list of intersections given to Richardson. But, on October 24, 2019, following the handwritten list of intersections, Richardson dropped off Child at the southeast corner of Goodfellow and Lalite. The

---

[18] It bears repeating: "The care which a school bus driver must exercise toward a school bus passenger is proportionate to the degree of danger inherent in the passenger's youth and experience." *Plummer*, 818 S.W.2d at 321 (quoting *Slade v. New Hannover Cnty. Bd. of Educ.*, 178 S.E.2d 316, 321 (N.C. App. 1971)). Child was merely nine years old and visibly shaken when he had to cross Goodfellow to return home the day before when being dropped off at the wrong corner of Goodfellow. Child also darted from the bus before being struck by the passing car.

video shows Child darting down the bus stairs and running around to the front of the school bus to begin crossing two lanes of traffic on Goodfellow without a crosswalk and being struck by the passing car disregarding the school bus's stop arm.

Furthermore, despite acknowledging the route sheet is for the school bus drivers, and it was generated with safety considerations such as knowing which side of the street Child lived, Manager still maintained Richardson did not need the route sheet. Despite testifying Richardson only needed the intersections, Manager admitted the handwritten list of intersections was incorrect, contained stops not on the route sheet, excluded certain stops, and did not indicate which corner the students were to be dropped off. Moreover, despite admitting there are situations in which certain students may not cross specific streets, requiring specified drop-off corners, Manager admitted Richardson was unfamiliar with the students. Finally, Manager testified:

Q: And [First Student] takes [transporting students] very seriously, correct?

A: Correct.

Q: That's because children can be injured if they're dropped off at a different location than they should be right?

A: Safety is considered in everything we do.

. . .

Q: Okay. In other words, children can be injured if they're dropped off at a different location than they should be, and your answer now and then was "yes"?

A: Correct.

Thus, under the standard of review, Child presented a submissible case by offering evidence from which the jury could reasonably find Child's injuries were the "foreseeable, natural product of [First Student's] original negligence" of failing to provide Richardson with sufficient information to drop off Child at his designated school bus stop rather than the passing car's

33

criminal conduct. *Plummer*, 818 S.W.2d at 321. Further, sufficient evidence supports the jury's implicit finding but for First Student not providing Richardson with sufficient information of Child's designated school bus stop location, Child would not have been injured by a passing car while crossing the two lanes of traffic on Goodfellow without a crosswalk. The passing car's conduct does not constitute an intervening superseding cause, but only constitutes a contributing cause, because without First Student's negligence, Child would not have been on the left side of the bus.[19]

### 4. Injuries & Damages

Finally, to prevail on his negligence claim, Child must establish "injury" or "actual damages." *Payne*, 543 S.W.3d at 118 (first quoting *Peters*, 489 S.W.3d at 793; then quoting *Friday*, 536 S.W.3d at 239). As reflected in the record, it is undisputed Child sustained injuries because of First Student's negligence. Child suffered a right ankle sprain and a left ankle fracture. Child's left ankle required surgery to place pins for stabilization, which were surgically removed later. Child required physical therapy. Child also underwent a skin graft surgery to alleviate pain at the surgical scar site, and therapy as he encountered emotional difficulty crossing streets, walking on parking lots with moving cars, and riding the bus to and from school.

Thus, Child has made a submissible case for negligence against First Student. Child established First Student owed him a legal duty separate from the duty to drop him off at a

---

[19] The dissenting opinion states, "the general rule is that *businesses* have no duty to protect *customers* from the criminal acts of unknown third persons." Emphasis added. The dissenting opinion then cites to *Wood v. Centermark Properties, Inc.*, 984 S.W.2d 517, 523–24 (Mo. App. E.D. 1998) which states, "Generally, the *owner of a business property* has no duty to protect an *invitee* from a deliberate criminal attack by a third person." Emphasis added. The dissenting opinion's reliance on premise liability cases concerning business properties owners and the duties owed to their customers or invitees is misplaced because the issue in this case does not involve a business property and their customer or invitee. The dissenting opinion's finding "the trial court record is bereft of any evidence of any prior crime, let alone numerous, recent, or similar crimes, at the southeast corner of Goodfellow and Lalite or anywhere in the vicinity" misunderstands the foreseeable danger at issue here. It is not the intersection that is the foreseeable danger. The foreseeable danger is the passing car which struck Child.

"reasonably safe" place as contemplated by Instruction No. 7. Child demonstrated First Student breached that duty because it was foreseeable he would be struck by a passing car while crossing the street when his school bus driver was not provided with sufficient information to drop him off at his designated school bus stop. Child proved First Student, rather than the passing car's criminal conduct, caused his injuries because they were a foreseeable, natural product of First Student's negligence, and he sustained damages.

Because Child made a submissible case establishing negligence, the circuit court did not err in overruling First Student's JNOV motion.

Points III and IV are denied.

### *Point I:* McGinnis *Doctrine*

### *Party Positions*

In Point I, First Student argues the circuit court erred in overruling its JNOV motion because it cannot be liable as a matter of law given the jury's verdict in Instruction No. 7 under the *McGinnis* doctrine. First Student claims the jury's verdict under this instruction found Defendants dropped off Child at a reasonably safe place, which was the "only" legal duty owed by them. First Student also argues because both it and Richardson were exonerated for fulfilling their "only" legal duty to Child, the *McGinnis* doctrine relieved First Student of any additional or separate liability submitted under Instruction No. 8.

Child argues the circuit court properly overruled First Student's JNOV motion because he presented substantial evidence supporting his negligence claim against First Student. Child claims First Student mischaracterizes the jury's finding under Instruction No. 7 because the jury had to find both First Student *and* Richardson were negligent for him to prevail. Child contends the jury could have reasonably concluded the southeast corner was not a reasonably safe place to drop him

off, but First Student and Richardson were not *both* negligent because First Student did not provide Richardson with a route sheet with the northwest corner designated stop information, thus relieving Richardson of liability. Child further argues the *McGinnis* doctrine only applies when a tort claim is based on *respondeat superior*. Here, Child argues he presented substantial evidence supporting a submissible case of negligence against First Student unrelated to any negligence by Richardson.

*Analysis*

"Under the *McGinnis* [d]octrine, 'when a claim is submitted on the theory of *respondeat superior* and the jury returns inconsistent verdicts, exonerating the employee, but holding against the employer, the court must grant the employer judgment notwithstanding the verdict.'" *Harrison v. Harris-Stowe State Univ.*, 626 S.W.3d 843, 854 (Mo. App. E.D. 2021) (quoting *Burnett v. Griffith*, 739 S.W.2d 712, 713 (Mo. banc 1987)). But, "the *McGinnis* [d]octrine does not apply unless the employer's liability depends *entirely* on the conduct of the exonerated employee." *Id.* (emphasis added).

Contrary to First Student's argument, the *McGinnis* Doctrine is inapplicable. As explained, dropping off Child at a reasonably safe place may be *one* of the duties owed by First Student, but the law does not foreclose courts from finding other duties. *See generally Hoffman*, 176 S.W.3d at 706. First Student's negligent liability submitted under Instruction No. 8 did not depend on Richardson's conduct. Rather, Instruction No. 8 sets forth a separate, distinct theory of First Student's negligent liability: whether First Student had a duty to provide Child's school bus driver, Richardson, with sufficient information as to Child's designated school bus stop location given the foreseeability of danger to a child dropped off at a different location other than their designated school bus stop location. Thus, the *McGinnis* doctrine does not preclude First Student from being

36

found negligent under Instruction No. 8. The circuit court did not err in overruling First Student's JNOV motion on this claim.

Point I is denied.

*Point II:* McHaffie *Rule*

*Party Positions*

In Point II, First Student argues the circuit court erred in overruling its JNOV motion regarding its direct negligence because Instruction No. 8 improperly submitted an additional, independent theory of imputed liability in violation of the *McHaffie* rule. First Student maintains the *McHaffie* rule precluded Child's additional direct negligence claim from being submitted to the jury once First Student admitted Richardson was acting in the course and scope of her employment and the "only" legal duty owed to Child was to drop him off in a reasonably safe place.

Child argues the circuit court properly overruled First Student's JNOV motion because the *McHaffie* rule does not apply to his direct negligence claim as the claim is not derivative or dependent upon Richardson's alleged negligence. Child argues his negligence claim submitted in Instruction No. 8 was not based on *respondeat superior* liability or on Richardson's negligence. Rather, Instruction No. 8 was based on First Student's failure to inform Richardson about the route details, thereby breaching its duty given the foreseeable danger of a child being struck by a passing car, which caused or contributed to cause Child's injuries.

*Analysis*

Under the *McHaffie* rule, "once an employer has admitted *respondeat superior* liability for a driver's negligence, it is improper to allow a plaintiff to proceed against the employer on any other theory of imputed liability." *McHaffie*, 891 S.W.2d at 826. In other words, "*McHaffie*

37

prohibits a plaintiff from going to the jury on multiple alternative theories of *imputed* liability." *Coomer v. Kansas City Royals Baseball Corp.*, 437 S.W.3d 184, 206 (Mo. banc 2014). "[I]t may be possible that an employer or entrustor may be held liable on a theory of negligence that does not derive from and is not dependent on the negligence of an entrustee or employee." *McHaffie*, 891 S.W.2d at 826.

Here, Instruction No. 8 is not premised on a theory of imputed liability or on Richardson's negligence. *Cf. Coomer*, 437 S.W.3d at 206 (the plaintiff was still required to show an employee was negligent before the jury can award any damages under claims of negligent training or supervision). Instead, as posited by *McHaffie*, Instruction No. 8 sets forth a separate theory of negligent liability: whether First Student had a duty to provide Child's school bus driver, Richardson, with sufficient information as to Child's designated school bus stop location given the foreseeability of danger to him when dropped off at a different location than his designated school bus stop. Thus, the *McHaffie* rule does not preclude First Student from being found negligent under Instruction No. 8. The circuit court did not err in overruling First Student's JNOV motion on this claim.

Point II is denied.

### Conclusion

The circuit court's judgment is affirmed.

_____
Philip M. Hess, Judge

Robert M. Clayton III, P.J. concurs.
Cristian M. Stevens, J. dissents in a separate opinion.

38



# In the Missouri Court of Appeals
## Eastern District
### DIVISION ONE

D.J., By and Through
His Next Friend, ROSE JACKSON,

    Plaintiff/Respondent,

vs.

FIRST STUDENT, INC.,

    Appellant,

and

TOMIKA L. RICHARDSON,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. ED111487

Appeal from the Circuit Court
of the City of St. Louis
1922-CC11968

Honorable Rex M. Burlison

Filed: June 25, 2024

### DISSENTING OPINION

I respectfully dissent from the majority's opinion affirming the judgment of the circuit court. The majority bases its holding that the circuit court did not err in denying First Student's motion for JNOV on two conclusions, both of which are necessary to its outcome: (1) we may create legal duties independent of the established legal duty in "bus drop-off" cases; and (2) there was a foreseeable likelihood that the particular intervening criminal acts of the hit-and-run driver would cause injury to Plaintiff. Neither the record nor the law supports these conclusions or the majority's holding.

Plaintiff was struck by a hit-and-run driver after alighting from a school bus at the southeast corner of Goodfellow and Lalite on October 24, 2019. The substitute bus driver, Richardson, activated the eight-way flashing amber lights and extended the stop arm on the school bus to warn motorists that students were alighting from the bus. Plaintiff exited and crossed in front of the bus. The hit-and-run driver, who was stopped behind the bus, suddenly accelerated around the left side of the bus, crossing the double-yellow line into the oncoming traffic lane. Richardson laid on the bus horn, but the vehicle struck Plaintiff, continued through the stop sign at the intersection, and sped away. Plaintiff suffered a fractured left ankle and a sprained right ankle and limped back to the bus. The hit-and-run driver was never identified.

This action for personal injuries then was filed on behalf of Plaintiff against First Student and Richardson. The jury found that Plaintiff was dropped off at a reasonably safe location in favor of First Student and Richardson on the negligence claim submitted in Instruction No. 7. But the jury also returned a verdict in favor of Plaintiff on the direct negligence claim against First Student submitted in Instruction No. 8 and awarded Plaintiff $1.3 million in compensatory damages. Instruction No. 8 asked the jury to determine whether First Student was negligent by failing to: provide Richardson with a copy of the route sheet; or tell Richardson that the route sheet stated "NW CRNR"; or tell Richardson that Plaintiff's grandmother's house was located on Lalite Avenue west of Goodfellow. The circuit court entered judgment consistent with the jury's verdicts. First Student timely filed its motion for JNOV, which was heard and denied.

As the majority correctly states, in reviewing the circuit court's decision on a motion for judgment notwithstanding the verdict, this Court determines whether the plaintiff made a submissible case by offering evidence to support every element necessary for liability. *Harner v. Mercy Hospital Joplin*, 679 S.W.3d 480, 483 (Mo. banc 2023). In any negligence action, the

2

plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury. *Id.* at 484.

First Student raises four points on appeal. Because Points I and IV are dispositive, I do not address Points II and III.

*Point I*

In Point I, First Student argues the circuit court erred in denying its motion for JNOV because the jury determined that First Student and Richardson dropped Plaintiff off at a reasonably safe place, which is the only legal duty owed to Plaintiff in this kind of case, and therefore First Student could not be held liable on the direct negligence claim as a matter of law.

When the jury returned a verdict in favor of both Defendants on Instruction No. 7, the jury explicitly determined that Plaintiff was dropped off at a safe place. Under Missouri law, the only legal duty of a bus company to its passenger in a "bus drop-off" case is to select and stop its bus at a place "reasonably safe" for the passenger to alight. *Goedecke v. Bi-State Dev. Agency of Missouri-Illinois*, 412 S.W.2d 189, 192 (Mo. App. St. Louis 1967) (explaining that bus company's "only duty was to select and stop its bus at a place reasonably safe for [plaintiff] to alight"); *Sanford v. Bi-State Dev. Agency*, 705 S.W.2d 572, 575 (Mo. App. E.D. 1986) (stating general rule that "once a passenger alights at a safe location, the carrier is no longer liable for the injuries sustained by the former passenger in crossing the street," and collecting cases); *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 307 (Mo. banc 1978) (distinguishing cases in which plaintiff alighted at safe location where bus stopped in unsafe location over center line where traffic could pass on left or right, bus driver failed to deploy stop arm despite that child plaintiff had to cross street to get home, and bus driver saw vehicle passing on left before child disembarked); *Plummer v. Dace*, 818 S.W.2d 317, 320 (Mo. App. E.D. 1991) ("It is well settled

in Missouri that the duty of a common carrier to exercise the highest degree of care for its passengers continues at least until the passenger has been discharged at a reasonably safe place."); *Moore ex rel. Moore v. Bi-State Dev. Agency*, 87 S.W.3d 279, 293–94 (Mo. App. E.D. 2002) (abrogated on unrelated grounds). This legal duty of the bus company can be fulfilled only through the bus driver. *Goedecke*, 412 S.W.2d at 192.

Accordingly, when, as here, a jury determines a bus driver fulfilled her legal duty to drop a passenger at a reasonably safe place, there can be no breach of that duty by the bus company, and a plaintiff is not entitled to submit a claim against the bus company on any other theory of negligence. *Id*. Because the jury determined First Student fulfilled its legal duty to Plaintiff in Instruction No. 7, First Student is entitled to JNOV on the direct negligence claim submitted in Instruction No. 8.

In challenging this argument, Plaintiff insists the jury did not find that First Student and Richardson dropped Plaintiff off at a reasonably safe place. Specifically, Plaintiff argues, "A jury could have reasonably concluded that the southeast corner was not a reasonably safe drop off location because it required [Plaintiff] to cross Goodfellow to get home, but that [Richardson] and First Student were not *both* negligent." Plaintiff's argument fails.

Instruction No. 7 provided in relevant part:

> Your verdict must be for [Plaintiff] and against Defendants Tomika Richardson and First Student, Inc. if you believe:
>
> First, [Plaintiff] was not dropped off at the northwest corner of Goodfellow and Lalite on October 24, 2019; and
>
> Second, the southeast corner of Goodfellow and Lalite was not reasonably safe; and
>
> Third, Defendants were thereby negligent; and

4

Fourth, such negligence directly caused or directly contributed to cause damage to [Plaintiff] . . . ."

In its verdict form "[o]n the claim of Plaintiff D.J. for personal injuries under Instruction Number 7 against Defendants Tomika Richardson and First Student, Inc.," the jury found "in favor of: Defendants Tomika Richardson and First Student, Inc."

There is no record of Plaintiff objecting to Instruction No. 7 or the verdict form, or that they listed Defendants in the conjunctive. Nor does Plaintiff challenge the instructions on appeal, and for good reason. As stated, in cases in which a passenger is injured upon alighting at a bus stop, the sole recognized legal duty of the bus company is to select and stop at a location that is "reasonably safe" for the plaintiff to alight. *Plummer*, 818 S.W.2d at 320. Because that duty can be fulfilled only through the bus driver, *Goedecke*, 412 S.W.2d at 192, Plaintiff's suggestion that the jury found Richardson or First Student, but not both, negligent fails as a matter of law. Instruction No. 7 otherwise specifically required a finding by the jury that the southeast corner of Goodfellow and Lalite was not reasonably safe for the jury to find Richardson and First Student negligent. By returning a verdict in favor of Richardson and First Student on the facts of this case, the jury necessarily determined the drop-off location was reasonably safe.

In *Plummer*, the plaintiff, a six-year-old student, was injured when she was dropped off at the wrong school bus stop on the east side of Highway 185, crossed the street to the west side of the highway, the same side on which her house was located, and was struck by a vehicle after the bus departed. *Id*. at 318. The plaintiff filed suit against the bus driver for negligently dropping her off at an unsafe place. *Id*. The circuit court granted summary judgment in favor of the bus driver, finding that any danger caused by the bus driver in dropping off the plaintiff ceased to be the proximate cause of her injuries when she got to the "safe" side of the street and the bus departed. *Id*. at 320.

In reversing the circuit court, our Court analyzed and resolved two issues: (1) whether the plaintiff was dropped off at a reasonably safe place to alight from the bus, and if not, (2) whether the bus driver's conduct was too remote or was the proximate cause of the plaintiff's injuries. *Id*. With respect to the first issue, what constitutes a "reasonably safe" place depends on the circumstances of each case, and the evidence presented. *Id*. Under the facts presented in the summary judgment pleadings, the *Plummer* Court concluded the circuit court erred in finding that the plaintiff was dropped off at a safe place. *Id*. at 320–21. *Plummer* stands for the proposition that the duty owed to a student alighting from a school bus is to drop him or her off at a reasonably safe place. If the legal duty has been fulfilled, the analysis ends. If not, then the analysis continues to determine proximate causation. *Id.* at 321.

The pivotal difference between *Plummer*, a summary judgment case, and the present case is that, here, the trial jury found Plaintiff was dropped off at a reasonably safe place and, therefore, that Richardson and First Student had fulfilled their legal duty. Once the jury made that determination, there could be no breach of duty to support the claim of negligence under Instruction No. 8.

Plaintiff maintains that "First Student owed a duty to provide the information needed to prevent a foreseeable incident like this from happening." Plaintiff cites no case law to support this new legal duty because there is none, consistent with the binding case law governing bus drop-off cases.[1] This makes perfect sense considering that, if, as the jury determined, Plaintiff was dropped off at a safe place, then whether First Student failed to provide additional

---

[1] In footnote 16, the majority distinguishes some of the above cases because they do not involve school buses. Like Plaintiff, the majority cites no cases involving school buses and the "independent" duty it finds, because there are none.

information to Richardson is irrelevant. There simply is no duty under Missouri law to drop a student off at the safest possible place, or even an arguably safer place.

The majority nevertheless finds an additional duty arising out of First Student's contract with KIPP, assuming a duty by its conduct, and/or public policy considerations: "a duty to provide Plaintiff's school bus driver with sufficient information as to Plaintiff's designated school bus drop-off location to avoid a foreseeable injury."[2] In footnote 11, the majority qualifies this new duty:

> This Court is not making a broad public policy statement that all school bus companies must drop off all school children at a residential corner such that no child ever crosses through the danger zone for passing cars. That is not the duty we are examining or deciding. This opinion addresses the duty to inform drivers of existing designated drop-off locations for specific students, given their age and residential location.

Even with its qualification, the majority cannot overcome the fact that Plaintiff was dropped off at a reasonably safe place and, therefore, neither First Student nor Richardson was negligent under Instruction No. 7. Of course, the jury's finding that Plaintiff was dropped off at a reasonably safe place had to account for Plaintiff's "age and residential location," among the other relevant circumstances of this case. Accordingly, the inquiry ends and First Student could

---

[2] In footnote 4, the majority points out that, because the only established duty in a case like this is to drop Plaintiff off at a reasonably safe place, I do not otherwise address the majority's lengthy analysis discovering First Student's "independent" duty in the KIPP contract, KIPP's request for proposal, First Student's "Commercial Driver's License Training Program Participant Study Guide," and various sections of the Missouri Code of State Regulations. Notably, neither does Plaintiff. Plaintiff did not cite any of these sources before the circuit court in support of Instruction No. 8 or in the argument section of its appellate brief in support of the duty cobbled together by the majority. Instead, Plaintiff cites "common law factors" to support its argument that "First Student owed a duty to provide the information needed to prevent a foreseeable incident like this from happening." Regardless of the source of this new duty, I fully address below the reasons the criminal acts of the hit-and-run driver were not reasonably foreseeable, which is all that matters.

7

not be liable on the direct negligence claim in Instruction No. 8. *See Id*. The circuit court erred in denying First Student's motion for JNOV.

*Point IV*

Point IV offers another, independent basis on which the circuit court erred in denying the motion for JNOV. In Point IV, First Student points out that not only must a plaintiff prove that a defendant's negligent conduct amounted to a violation of some duty owed to him, but also that the conduct was the proximate cause of the plaintiff's injury.

As already established, the only recognized duty owed to Plaintiff by First Student was to select and stop at a reasonably safe place for Plaintiff to alight, *Plummer*, 818 S.W.2d at 320, and First Student met that duty. Even if that was not the only duty of First Student to Plaintiff, and even if First Student had not met that duty, it still would not be liable for the criminal acts of the hit-and-run driver. In our system of justice, civil defendants generally are not liable for the intervening criminal acts of third parties. *See, e.g.*, *Harner*, 679 S.W.3d at 484; *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Center Co.*, L.P., 75 S.W.3d 247, 257 (Mo. banc 2002); *Ford v. Monroe*, 559 S.W.2d 759, 762 (Mo. App. 1977); *Dix v. Motor Mkt., Inc.*, 540 S.W.2d 927 (Mo. App. 1976).

The Supreme Court of Missouri recently reiterated, "As a general rule, businesses have no duty to protect invitees from the criminal acts of unknown third persons." *Harner*, 679 S.W.3d at 484 (citing *L.A.C.*, 75 S.W.3d at 257). On more than one occasion, this Court has listed the reasons for that rule, including:

> "judicial reluctance to tamper with a traditional, common law concept; the notion that the deliberate criminal act of a third person is the intervening cause of harm to another; the difficulty that often exists in determining the foreseeability of criminal acts; the vagueness of the standard the owner must meet; the economic consequences of imposing such a duty; and conflict with the public policy that

8

> protecting citizens is the government's duty rather than a duty of the private sector."

*Wood v. Centermark Properties, Inc.*, 984 S.W.2d 517, 524 (Mo. App. E.D. 1998) (quoting

*Faheen v. City Parking Corp.*, 734 S.W.2d 270, 272 (Mo. App. E.D. 1987)).

The Supreme Court and this Court most often have applied this general rule in cases in which invitees were injured by the criminal acts of third persons on business owners' premises. *See Wood*, 984 S.W.2d at 523-24 ("Generally, the owner of a business property has no duty to protect an invitee from a deliberate criminal attack by a third person."). A limited exception to the rule nonetheless recognizes a duty on the part of businesses to protect invitees to their premises from the criminal actions of unknown third persons when "there is a foreseeable likelihood that particular acts or omissions will cause harm or injury." *L.A.C.*, 75 S.W.3d at 257; *Madden v. C&K Barbeque Carryout, Inc.*, 758 S.W.2d 59, 62 (Mo. banc 1988).

Plaintiff argues that First Student "knows that this exact situation can occur when students are dropped off at the wrong location." The majority concludes, "It is not unexpected or freakish that a driver might disregard traffic laws and strike a pedestrian. Here, any passing car would necessarily do so in violation of section 304.050.1(1), which requires motorists to stop." (internal alteration and citation omitted). Suffice it to say the foreseeability that a hit-and-run driver may strike any pedestrian, at any intersection, at any time is not enough to meet the limited exception.

When the Supreme Court of Missouri created the exception to the rule that businesses are not liable for the criminal acts of unknown third persons, it required "evidence of prior criminal incidents sufficient to alert management to the possibility that its patrons might be in danger." *Madden*, 758 S.W.2d at 62 (citing *Virginia D. v. Madesco Investment Corp.*, 648 S.W.2d 881, 888 (Mo. banc 1983)); *see also L.A.C.*, 75 S.W.3d at 258 ("Violent crimes are foreseeable if the

9

premises have been the site of other prior violent crimes . . . .”). That is, the exception requires, among other things:

> “prior specific incidents of violent crimes on the premises that are sufficiently numerous and recent to put a defendant on notice, either actual or constructive, that there is a likelihood third persons will endanger the safety of the defendant’s invitee;” and . . . “the incident causing the injury must be sufficiently similar in type to the prior specific incidents occurring on the premises that a reasonable person would take precautions to protect his or her invitees against that type of activity.”

*Wood*, 984 S.W.2d at 524 (quoting *Faheen*, 734 S.W.2d at 273-74).

The cases providing examples of specific incidents of crime sufficiently numerous, recent, and similar to impose a duty on a business to protect a patron from criminal activity are ubiquitous. *See, e.g.*, *L.A.C.*, 75 S.W.3d at 253-54, 259 (holding reports of numerous violent and non-violent crimes against female victims rendered rape of plaintiff foreseeable and imposed duty on defendant to protect customers); *Madden*, 758 S.W.2d at 61-63 (observing allegations of armed robbery, purse snatching, and multiple thefts “might not be sufficient to establish a duty of care,” but holding additional armed robberies, assaults, and flourishing over three years sufficient to establish duty); *Wood*, 984 S.W.2d at 525 (collecting cases); *Brown v. National Supermarkets, Inc.*, 679 S.W.2d 307, 309-10 (Mo. App. E.D. 1984) (holding 16 armed robberies, seven strong arm robberies, and 136 other crimes over two years gave rise to duty to protect plaintiff from assault by unknown assailant); *cf. Wood*, 984 S.W.2d at 524-25 (holding 80 violent crimes over five years insufficiently numerous, similar, and recent to put defendant on notice of duty to protect decedent from carjacking, abduction, and murder).

This case is not one of them. In fact, here, the trial record is bereft of any evidence of any prior crime, let alone numerous, recent, or similar crimes, at the southeast corner of Goodfellow and Lalite or anywhere in the vicinity. To the contrary, the evidence was that the intersection is

in a residential neighborhood with two lanes of travel on both Goodfellow and Lalite and stop signs on all four corners. A yellow sign stating "STOP AHEAD" warns drivers as they near the southeast corner. That corner also is a designated drop-off location for Bi-State buses. Typically, Plaintiff was dropped off at the northwest corner and had to cross two lanes of traffic on Lalite to get home. But the day before the incident at issue here, Richardson dropped Plaintiff off at the southeast corner. All drivers obeyed the four-way stop signs and the eight-way flashing lights and the stop arm of the school bus, and Plaintiff safely crossed Goodfellow, instead of Lalite. Under these circumstances, according to the controlling precedent of this Court and of the Supreme Court, First Student could not be liable for the criminal assault of Plaintiff by the hit-and-run driver.

In footnote 19, the majority distinguishes these cases as "premise liability cases concerning business properties owners and the duties owed to their customers or invitees," and points out that First Student's bus stops are not on premises controlled by First Student. The majority does not explain how that distinction makes First Student *more, not less*, readily liable for the criminal acts of unknown third persons. *See Wood*, 984 S.W.2d at 524 ("We also have held that to be considered under the violent crimes exception, the incident must occur on premises controlled by the defendant."). Even assuming the majority is correct that premises liability cases do not apply here, the default rule remains that civil defendants generally are not liable for the intervening criminal acts of third parties. In any event, premises liability cases apparently offer some guidance given the majority's repeated, in-depth reliance on *Taticek v. Homefield Gardens Condominium Association*, 502 S.W.3d 645 (Mo. App. E.D. 2016), a premises liability case, for the duty it finds here.

The majority continues in Footnote 19: "It is not the intersection that is the foreseeable danger. The foreseeable danger is the passing car which struck Child." This observation is contrary to the rest of the majority opinion and serves only to demonstrate my point. The rest of the majority opinion erroneously identifies the danger as First Student's failure to drop Plaintiff off at the designated location. My point is that the danger was the criminal conduct of the hit-and-run driver, which could have occurred at any location and, according to the applicable caselaw, was not reasonably foreseeable.

For the same reasons, the criminal actions of the hit-and-run driver, and not any negligence on the part of First Student, were the proximate cause of Plaintiff's injuries. While Plaintiff acknowledges the law of intervening cause, he entirely ignores the body of law regarding criminal acts of third parties intervening in the causal chain. *See, e.g.*, *Ford*, 559 S.W.2d at 762; *Dix*, 540 S.W.2d 927; *see also Wiener v. Southcoast Childcare Centers, Inc.*, 32 Cal. 4th 1138, 88 P.3d 517, 12 Cal. Rptr. 3d 615 (Cal. 2004) (holding child care center not liable for third person's intentional criminal act of driving car onto playground and killing children because criminal act was unforeseeable when there had been no reported prior similar criminal acts at or near child care center). According to that long-established body of law:

> A fortiori, if no duty exists, there can be no violation of a duty upon which to predicate a recovery. On the other hand if it be assumed, arguendo, that defendant was negligent in the first instance, it is a general principle that if a criminal act by a third person intervenes and produces plaintiff's injury which was not intended by defendant and could not have reasonably been foreseen by him, the causal chain between the defendant's negligence and the plaintiff's injury is broken.

*Ford*, 559 S.W.2d at 762. As already explained at length, First Student met its only duty to Plaintiff. Even if that was not the case, the requisite evidence that the criminal act perpetrated against Plaintiff was reasonably foreseeable is nowhere to be found in the record. Therefore, the causal chain between First Student's alleged negligence and Plaintiff's injuries is broken.

12

The legal cause of Plaintiff's injuries was not that Richardson was not provided a route sheet or Plaintiff's grandmother's address, or even that Plaintiff had to cross the street.[3] Plaintiff's injuries are solely attributable as a matter of law to the unforeseen criminal actions of the hit-and-run driver who crossed the double-yellow line into the oncoming traffic lane, ran through the eight-way flashing lights on the school bus, struck Plaintiff, ran through the stop sign at the intersection, and sped away, fleeing the scene.[4]

On the trial record here and pursuant to controlling precedent, there was no foreseeable likelihood that Plaintiff would be injured by these particular intervening criminal acts of the hit-and-run driver at the southeast corner of Goodfellow and Lalite. To conclude otherwise would eviscerate the rule that defendants have no duty to protect patrons from the criminal acts of unknown third persons and that such criminal acts are the intervening proximate cause of any resulting injuries.

## Conclusion

Because the jury determined that First Student satisfied its legal duty to Plaintiff by dropping him off at a reasonably safe place in Instruction No. 7, the circuit court erred in failing to enter JNOV in favor of First Student on Plaintiff's direct negligence claim as a matter of law

---

[3] In fact, the jury determined that the southeast corner was a reasonably safe drop-off location, despite Plaintiff's having to cross the street, and the majority declines to make "a broad public policy statement that all school bus companies must drop off all school children at a residential corner such that no child ever crosses through the danger zone for passing cars."

[4] The majority argues that requiring Plaintiff to cross the street on the left side of the bus created the conditions for the injury, which First Student should have foreseen. I would argue that even if Plaintiff was dropped off at the designated stop, remained on the right side of the bus, and was required to cross Lalite as usual, which the majority concedes is not prohibited by State law or even the duties it imposes here, he still would be susceptible to the unpredictable criminal acts of a hit-and-run driver. In both situations, such criminal conduct could not be foreseen or prevented and the criminal actions of the driver, not any alleged negligence on the part of First Student, would be the direct, proximate, and immediate cause of Plaintiff's injury.

in Instruction No. 8. Moreover, First Student had no duty to protect Plaintiff against intervening criminal acts, which broke the causal connection between First Student's alleged negligence and Plaintiff's injuries. For these reasons, I would reverse the judgment rendered against First Student in Instruction No. 8 and remand to the circuit court with directions to enter JNOV in favor of First Student.

Cristian M. Stevens, Judge